Wilmot, J.,
delivered the opinion of the Court.
Virginia in her deed of cession to the United States of March 1, 1784, of the territory northwest of the river Ohio, made therein a reservation in the following words : “That in case the good lands on *126 the southeast of the Ohio, upon the waters of the Cumberland river and between the Green river and Tennessee river, which have been reserved by law for Virginia troops upon continental establishment, should, from the North Carolina line bearing in further upon the Cumberland than was expected, prove insufficient for their legal bounties, the deficiencies shall be made up to said troops in good lands, to be laid off between the rivers Sciota and Little Miami, on the northwest side of the river Ohio, in such proportions as have been engaged to them by the laws of Virginia. That all the lands within the territory so ceded to the United States, and not reserved for or appropriated to any of the before-mentioned purposes, or disposed of in bounties to the officers and soldiers of the American army, shall be considered as a common fund for the use and benefit of such of the United States as have become or shall become members of the confederation orfederal alliance of the said States, Virginia inclusive, according to the usual respective proportions in the general charge and expenditure, and shall he faithfully and bona fide disposed of for that purpose, and for no other use or purpose whatsoever.”
There are two beneficiaries of the trust here created — the troops of Virginia on continental establishment and the States of the confederation. All the lands not required to satisfy the bounties given by Virginia to her officers and soldiers upon continental establishment were to be “ considered as a common fund for the use and benefit of the States, to be disposed of faithfully and bona fide for that and for no other purpose whatsoever.” The trust in favor of the States was of vital importance. The lands covered by the deed of cession from Virginia constituted by far the largest fund the nation possessed with which to pay the debt necessarily incurred in the long war which secured our national independence. It was especially to provide for the payment of this debt that Congress urged upon the States to cede to the nation the vast tracts of wild and unoccupied lands owned or claimed by them.
The constitutional government, with the assent of all the States, took upon itself the trust under the deed of cession, and assumed the duties which its acceptance imposed on the confederation. Congress could not execute the trust confided to it, except by fixing limits, either of boundary or of time, within which the military beneficiaries of the trust should appropriate the lands reserved for their use. The whole country between the Sciota and Little Miami rivers was not reserved, but only so much as was necessary to make up the deficiency *127 of good lands southeast of the Ohio, to satisfy the bounties given by Virginia to her Revolutionary officers and soldiers; and in no way, except by the limitations before mentioned, could the lands reserved be separated from the common mass. The establishment of the western boundary of the reserve was not only required to define the district within which Virginia military warrants might be located, but also to fix the boundary of the lands immediately west, bound by the trust in favor of the nation, which, otherwise, could not be disposed of for the common use and benefit of all the States. To leave this boundary without lawful and binding settlement for more than half a century— from 1784 to 1838, when the locations were made on the claimant’s warrants — was to neglect the duties imposed by the trust, encourage litigation and disputes respecting titles, and retard the settlement and improvement of the country. Congress might not with unreasonable haste, and in disregard of the rights of Virginia officers and soldiers, establish this boundary line; but was bound to seek the agreement of Virginia thereto, and all efforts in this direction ought to be characterized with entire good faith. The agreement of Virginia being unreasonably delayed, or refused to a just and fair line, it became the duty of Congress to settle such boundary by legislative enactment. The right to do so, grows out of the necessities connected with the execution of the trust.
It is proper to review the legislation of Congress on this subject aud bring to notice the efforts made to obtain the agreement of Virginia to a settlement of the western boundary of the military reserve. By the first section of the act of 23d of March, 1804, it was enacted : “ That the lino run under the direction of the surveyor general of the United States, from the source of the Little Miami towards the source of the Sciota, and which bounds on the east the surveys of the lands of the United States, shall, together with its course continued to the Sciota river, be considered and held as the westerly boundary line, north of the source of the Little Miami, of the territory reserved by the State of Virginia, between the Little Miami and Sciota rivers, for the use of the officers and soldiers of the continental line of that State: Provided, That the State of Virginia shall, within two years after the passage of this act, recognize such line as the boundary of the said territory.” The line here referred to is the Ludlow line, run in 1802. Virginia did not recognize or assent to this line, and the western boundary remained unsettled, as before the passage of the act.
By an act of Congress of the 26th of June, 1812, the President is authorized to appoint three commissioners to act with such commis *128 sioners as may be appointed by the State of Virginia; and the first section then provides “that such commissioners thus appointed ‘shall have full power and authority to ascertain, survey, and mark, according to the true intent and meaning of the condition touching the military reservation in the deed of cession from the State of Virginia to the United States of the land northeast of the river Ohio, the westwardly boundary line of said reservation between the Little Miami and Sciota rivers.’ ”
Section four enacts : “That until the westwardly boundary line of said reservation shall be finally established by agreement and consent of the United States and the State of Virginia, the boundary line , designated by the act of Congress passed on the 23d day of March, 1804, shall be considered and held as the. proper boundary line of the aforesaid reservation.”
Commissioners were appointed by Virginia, who met the commissioners of the United States, and a straight line was run by Roberts, who was the surveyor employed, from tiie source of the Little Miami, starting near the point of Ludlow’s line on that river, to the source of the Sciota. This line bore some degrees further west than Ludlow’s, thus making a long triangular gore of land between the two rivers. Upon this gore of land, south of the Greenville treaty line, the claimant, in 1S3S and ’39, located his military warrants. After the Roberts line was run, the Virginia commissioners would not agree to it, but demanded that a line from the source of the Sciota to the mouth of the Little Miami should mark the western boundary of the reservation.
The action of this commission would very certainly have resulted in the establishment of the Roberts line as the boundary, but for the unreasonable course of the Virginia commissioners. It was unquestionably a true line from the source of the Little Miami to the source of the Sciota, whereas an extension of Ludlow’s line to the Sciota would strike that river some miles below its source. The act of 1812, in substance, declared that the Ludlow line should be the proper western boundary of the reservation until such boundary should be agreed upon between Virginia and the United States. The matter was left open for future agreement between the parties. Virginia never assented to the Roberts line, nor has she sought any further action of the United States in the premises. In 1818 Congress took upon itself the definite settlement of this matter. Over thirty years had passed since the deed of cession. There was no prospect of coming to1 an agreement with Virginia touching this western boundary. *129 In 1804 the Ludlow line had been tendered for the aeeeptance of Virginia; again, in 1812, the Roberts line was offered; Virginia agreed to neither. Every interest demanded that the boundary should be settled and finally established. Under such circumstances Congress passed the act of the 11th of April, 1818. The third section of that act is as follows :
“And be it further enacted, That from the source of the Little Miami river to the Indian boundary line established by the treaty of Green-ville, in the year one thousand seven hundred and ninety-five, the line designated as the westerly boundary line of the Virginia tract, by act of Congress passed the twenty-third day of March, one thousand eight hundred and four, entitled ‘ An act to ascertain the boundary of the lands reserved by the State of Virginia, northwest of the river Ohio, for the satisfaction of her officers and soldiers on continental establishment, and to limit the period for locating the said lands,’ shall be considered and held to be such until otherwise directed by law. And from the aforesaid Indian boundary line to the source of the Sciota river, the line run by Charles Roberts, in one thousand eight hundred and twelve, in pursuance of instructions from the commissioners appointed on the part of the United States to establish the western boundary of the said military tract, shall be considered and held to be the westerly boundary line thereof; and that no patent shall be granted on any location and survey that has or may be made west of the aforesaid respective lines.”
This act establishes the Ludlow line as the boundary south of the Greenville treaty line. It is not believed that the courts of the country have ever held that a claimant under a Virginia military warrant acquired any legal or equitable right whatever by virtue of a location and survey south of the Greenville treaty line and west of Ludlow’s, where such location was made subsequent to the 26th of June, 1S12. In the cases of Doddridge v. Thompson, 9 Wheaton, and Reynolds v. McArthur, 2 Peters, the lands in controversy were located within these lines, and the titles under the military warrants prevailed, exclusively on the ground that at the time of the location of the warrants, in 1810, no legislation of Congress had fixed the western boundary of the reserve, or had in 'any manner prohibited such locations. In neither case is the right of Congress questioned to establish such boundary, and to prohibit locations and surveys, except within the limits prescribed.
We give the syllabus of the case in 9th Wheaton :
*130 “Under the reserve contained, in the cession act of Virginia and under the-acts of Congres. “August 10, 1790, and of June 9, 1794, the whole country lying between the Sciota and Little Miami rivers was subject to the military warrants to satisfy which the reserve was made.
“ The territory lying between the two rivers is the whole country from their sources to their mouths ; and if no branch of either of them has acquired the name exclusive of another, the main branch to its source must be considered as the true river.
“ The act of June 26,1812, to ascertain the western boundary of the tracts reserved for military warrants, and which provisionally designates Ludlow’s line as the western boundary, did not invalidate the title to land between that line and Roberts’s line acquired under a Virginia military warrant previous to the passage of that act.
“ The land between Ludlow’s and Roberts’s lines was not withdrawn from the territory liable to be surveyed for military warrants by any act of Congress passed before the act of June 26, 1812.”
Such arc the points decided in the case of Doddridge v. Thompson. A principle is here established touching the source of rivers, that gives the. Roberts line as the true western boundary of the military reserve.; but it is not decided in this case, and we think it will not be in the future, that the Roberts line was the lawful boundary after the passage of the act of 1812.
We also give the syllabus of the case in 2d Peters:
“The lands northwest of the river Ohio, between the rivers Sciota and Little Miami, lying west of Ludlow’s lino, east of Roberts’s line, and south of the Indian boundary reserved by Virginia in her deed of cession to the United States of March, 1784, for the satisfaction of the military bounties Virginia had promised, were not, prior to 1810, by any legislative act of the government of the United States, withdrawn from appropriation under and by virtue of Virginia military land warrants. A patent issued on the 12th of October, 1812, founded upon a military land warrant for land within the reserved lands, is valid against a claimant of the same land holding under a sale made by the United States.”
Both cases proceed on the ground that the Roberts line is the true line, and, in so far as those cases were affected by it, the lawful boundary of the reserve. The only point in 2d Peters, and to this the opinion of Chief Justice Marshall is directed, is whether or not Congress had by enactments withdrawn any part of the reserve from appropri *131 ation under and by virtue of Virginia laud warrants prior to the inception of McArthur’s title in 1810. The right of Congress to establish the western boundary of the reserve at some time, failing to come to a,n agreement with Virginia, indeed upon the state of facts existing in 1812, is substantially conceded by the court in both cases. In Doddridge v. Thompson, after adverting to the act of 1812, the meeting of the commissioners under it, the running of the line by Roberts, the refusal of the Virginia commissioners to agree to it, and demanding a line from the source of the Sciota to the mouth of the Little Miami, the court says : “ This demand prevented an agreement establishing the Roberts line; and as the act of June, 18 L2, provisionally designates Ludlow’s line as the western boundary of the reserve until one should be finally established, with the consént of Virginia, it remains the boundary for the present. Had the plaintiff’s title been acquired subsequent to this act there would be much force in the objection to it.”
Again, on the same page, the court uses the following language : “And yet the land was, in fact, within the territory actually reserved at the time the survey was made, and no law had then been passed substituting any other line for the true one.”
The Roberts line is undoubtedly the true one. It is a straight line between the sources of the two rivers, the Sciota and Little Miami; all the lands between which rivers, if required to satisfy the bounties given by Virginia to her officers and soldiers upon continental establishment, were reserved in the deed of cession for that purpose. Congress early admitted a deficiency of good lands set apart for the bounties of Virginia on the southeast side Of the Ohio; but it was not until many years after that it was supposed all the lands reserved northwest of that river would be required to make good such deficiency. The country in the vicinity of the western boundary, for many years after .the cession, was an unknown wilderness; and down to.the beginning of this century, in some parts, was inhabited and owned by Indian tribes. It is doubted if, before the running of Roberts’s line in 1812, the sources of both the Little Miami and Sciota were accurately known. Congress early, and in good faith, sought a settlement of this boundary by agreement with Virginia. It did so inl804; and again in 1812 offered the line now, and for many years, admitted to be the true one. Virginia would not agree to it. In the year last mentioned, Congress established provisionally the Ludlow line as the boundary, and waited six years after that date for Virginia to take some steps looking towards an agreement. Virginia took no action in the premises whatever, when, *132 in 1818, Congress definitely established the boundary as it is at this time. We do not think that it becomes Virginia or her grantees now to complain of this boundary.
There is an obvious distinction between the true and the lawful boundary; nor does it follow that the lawful boundary is inequitable and unjust because it does not coincide with the true one. No agreement of the parties could make Roberts’s line any other than the true line between the sources of the rivers named. The physical geography of the country could not be changed, whatever agreement might be made touching this boundary. The two extreme points of the line to be run were fixed by natural landmarks; the sources of the Sciota and Little Miami rivers and a straight line between these points gave the true boundary, but not necessarily the lawful one. Had Virginia agreed to the boundary named in the act of 1804, beyond all cavil and doubt the Ludlow line, by the agreement of the parties, would have been the la^^ful western boundary of the reservation. ■ How often is the tme boundary between individual litigants set aside and another established by the decision of courts as legal, when the conduct of the parties or those under whom they claim have given to the boundary established, all the sanctions of justice and equity ?
Here we might rest in full confidence that the action of Congress in this matter of boundary was justified by the necessities of its position as executor of the trust and the circumstances under which the boundary was established. It is. a maxim that all acts of the sovereign are “ presumed to have been rightfully done.”
The entries and surveys upon the claimant’s warrants, on lands west of Ludlow’s line, were expressly forbidden by acts of Congress, the binding force of which has been affirmed by the Supreme Court. By the first section of the act of March, 1807, an extension of time is given for making locations and return of surveys on military warrants, and this proviso is inserted at the end of the section : -“Provided, That no locations as aforesaid, within the above-mentioned tract, shall, after the passage of this act, be made on tracts of land for which patents ' have previously issued, or which had been previously surveyed; and any patent which may, nevertheless, be obtained for land contrary to the provisions of this section, shall be considered null and void.” In every act since passed extending the time for making locations and returns of surveys this proviso is found. It constitutes, says the Supreme Court, in Jackson v. Clark et al., 1st Peters, 628, “ a limitation on the right, given by all subsequent laws, to locate and survey mili *133 tary warrants.” In an act entitled “ An act to extend the time for locating Virginia military land warrants and returning surveys thereon to the General Land Office,” passed the 20th of May, 1S26, there is added to the proviso before given the following clause: Nor shall any location be made on lands lying west of Ludlow’s line; and patents obtained contrary to this section are declared null and void. This proviso accompanied subsequent acts, extending the time for making location and return of surveys upon military land warrants, and was in full force when the locations on the warrants which are the foundation of the present claim were made ; and in the language of the Supreme Court, the proviso is a “condition of such extension’’ and a limitation on the right of the claimant to make a location on his warrants.
The first point made in the case of Jackson v. Clark et al., before cited, is “ that Congress could not rightfully limit the time within which military warrants should be located and surveyed.” Thus the point we are now considering was directly raised and adjudicated by the Supreme Court. We quote from the opinion of the court delivered by Chief Justice Marshall:
“The first point to be considered is .the objection to the limitation of time, prescribed by Congress, within which the military warrants granted by Virginia should be located. The plaintiff contends that no limitation can be fixed.
“ Although, then, the military rights constituted the primary claim on the trusts, that claim was, according to the intention of the parties, so to be satisfied as to still keep in view that other object, which was also of vital interest. This was to be effected only by prescribing the time within which th.e lands to be appropriated by those claimants should be separated from the general mass, so as to enable the government to apply the residue, which it was then supposed would be considerable, to the other purposes of the trust. The time ought certainly to be liberal. But unless some time might be prescribed, the other purposes of the trust would be totally defeated, and the surplus land remain a wilderness.
“ If the right existed to prescribe a time within which military warrants should be located, the right to annex conditions to its extension follows as a necessary c.onsequence. The condition annexed by Congress has been calculated for the sole purpose of preserving the peace and. quiet of the inhabitants by securing titles previously acquired.”
It may be claimed that as the act of 1807 only prescribed a limitation of time within which locations might be made, the limitation of limits and boundary, prescribed by the act of 1826, is unlawful and *134 wants the support of judicial sanction. The conditions in effect are the same upon the holders of unsatisfied military warrants. The holders of military warrants were deprived of the right to make a location after the 4th day of January, 1825, but for the act of the 20th May, 1826, and the subsequent acts further extending the time for locations and return of surveys, and in these acts the condition is prescribed that no location shall be made west of Ludlow’s line. Limitations of boundary only prescribed the district within which locations may be made; whereas a limitation of time absolutely prohibited locations unless made within the time prescribed. Of the two limitations the latter was the most restrictive and stringent.
We think the case of Jackson v. Clark et al., in 1st Peters, by direct and clear adjudication of the highest judicial tribunal of the country, settles conclusively that the warrants upon which this claim rests were located wrongfully and in violation of law, and that the claimant took no interest whatever in the lands covered by his location and surveys, and, as a consequence, no equitable right to the money which was the proceeds of their sale.
By the act of 30th of May, 1830, the holders of unsatisfied warrants of the Virginia army on continental establishment are authorized to surrender to the Secretary of the Treasury of the United States such warrants as remain unsatisfied, in" whole or in part, and to receive certificates of scrip for the same, at any time before the 1st of January, 1835, said scrip so be receivable in payment for any lands to be purchased at private sale at any land office established or to be established in the States of Ohio, Indiana, and Illinois.
Again, by the act'of the 31st of August, 1852, it is provided that all outstanding unsatisfied military warrants, issued prior to March 1, 1852, may bo surrendered to the Secretary of the Interior, who, on being satisfied that such warrants were fairly and justly issued, is authorized to issue scrip, in favor of the owner, for the whole or any portion thereof unsatisfied, at the rate of one dollar and twenty-five cents for each acre remaining unsatisfied, which scrip is receivable in payment of any lands owned by the United States subject to sale at private entry. By this act Congress made a liberal and ample indemnity to the owners of unsatisfied military warrants. There was a deficiency of good lands in the reserve, including the disputed district between the Ludlow and the Roberts lines, to satisfy all the bounties given by Virginia to her officers and soldiers of the Revolutionary army. There were in 1852 thousands of acres of public lands subject to sale at private entry, of as much, or of greater value, in a state of' *135 nature, than any lauds lying between-Roberts’s and Ludlow’s lines, and the claimant had only to surrender his warrants and take scrip therefor with which to pay for any lands he might enter. He can do so yet. If the most valuable lands have been taken up, or if the homestead bill has materially affected the value of such scrip, it is the claimant’s misfortune that he did not earlier avail himself of the liberal provision made for him, and all in like circumstances, by the act of 1S52.
Mr. Allen G-. Thurman and Mr. J. J. Coombs for complainant.
Mr. .T. J. Weed, Assistant Solicitor, for the government.
Congress has acted with entire good faith, towards the military beneficiaries of the trust created by the deed of cession from Virginia to the United States of March 1,1784. We hold that the western boundary of the reservation in said deed was rightfully established by the acts of 1812 and 1818, and that the claimant’s warrants were not located within the boundaries of said reservation. We also hold that the proviso in the act of 1826, and in the acts subsequent thereto, giving an extension of time within which military warrants might be located, was a condition upon which alone the claimant could be allowed the benefits of such extension of time for the location and return of surveys upon his warrants.
We direct that judgment be entered for the United States.